UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEWIS WILDER, as Trustee for the Lewis
Wilder Revocable Trusts, 12/10/2010, and
IROW WORKERS LOCAL UNION NO. 17
PENSION FUND,

       Plaintiffs,

and

AVON PENSION FUND, administered by
Bath and North East Somerset Council,
Individually and on Behalf of All Others
Similarly Situated,

       Lead Plaintiff,

vs.

NEWS CORPORATION, NI GROUP LTD.,
K. RUPERT MURDOCH, JAMES
MURDOCH, LES HINTON and REBEKAH
BROOKS,

       Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/31/2014

**MEMORANDUM**
**OPINION & ORDER**

11 Civ. 4947 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

    The Avon Pension Fund ("Avon") brings this action as lead plaintiff on behalf of a putative class that purchased News Corporation ("News Corp.") stock between February 15, 2011 and July 18, 2011 (the "Class Period").[1] (Consolidated Amended Class Action Complaint ("Cmplt." or "Complaint") (Dkt. No. 33) ¶ 1) News Corp. is a New York-based worldwide

---

[1] On June 5, 2012, this Court appointed Avon, a local government pension fund located in the United Kingdom ("U.K."), as lead plaintiff in this action. (Dkt. No. 31) Avon claims to have purchased shares of News Corp. common stock during the class period, and to have suffered losses as a result of the alleged federal securities laws violations committed by Defendants. (Cmplt. ¶ 21) The Iron Workers Local Union No. 17 Pension Fund, an Ohio-based public pension fund that also claims to have purchased News Corp. common stock during the Class Period, has joined this action as a named plaintiff. (Id. ¶ 22)

media conglomerate whose stock is listed and publicly traded on the NASDAQ exchange. (Id. at ¶¶ 2, 23) Plaintiffs allege that Defendants deliberately concealed information regarding illegal newsgathering practices at two News Corp. newspapers – The Sun and the now-defunct News of the World – and that the eventual public revelation of these practices harmed investors by causing News Corp.'s stock price to plummet. (Id. at ¶¶ 3-5, 10-14) The Complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act against News Corp., its wholly-owned U.K. subsidiary NI Group Limited ("NI Group"),[2] and four of the companies' officers and directors – K. Rupert Murdoch, James Murdoch, Les Hinton, and Rebekah Brooks. (Id. at ¶¶ 194-209)

Defendants NI Group and Brooks have moved to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). All Defendants have moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[3]

## BACKGROUND

The following facts, accepted as true for purposes of this motion, are set forth in the Consolidated Amended Class Action Complaint filed on July 31, 2012. (Dkt. No. 33)

This action arises from Defendants' purported scheme to conceal the existence and extent of illegal newsgathering practices at the News of the World and The Sun. Evidence of those practices first came to light in 2006, when police arrested News of the World reporter Clive Goodman and investigator Glenn Mulcaire on suspicion of hacking the phones of royal family members. (Cmplt. ¶¶ 44-45) The ensuing investigation suggested rampant phone hacking by News of the World employees. (Id. ¶¶ 47-49) The police conveyed their concerns to

---

[2] Defendant NI Group was formerly known as News International Limited. (Cmplt. ¶ 1)
[3] Corporate Defendants News Corp. and NI Group, together with individual defendants Rupert and James Murdoch, have filed a joint motion to dismiss (Dkt. No. 46). Defendants Brooks (Dkt. No. 57) and Hinton (Dkt. No. 63) have each moved separately.

NI Group privately to Brooks, but – aside from terminating Goodman and Mulcaire – no further action was taken by NI Group, News Corp. or the police. (Id. ¶¶ 46-47)

Goodman and Mulcaire were prosecuted and eventually sentenced to prison for their crimes. Defendants, meanwhile, repeatedly assured the public and News Corp. investors that the phone hacking was an isolated incident limited to a single rogue reporter. (Id. ¶¶ 44-45, 75, 100, 116, 127) It has since been revealed, however, that reporters at the News of the World and The Sun routinely hacked the phones of celebrities and other public figures, and paid bribes to government officials to acquire sensitive information. Details of these misdeeds emerged gradually as a result of several lawsuits filed by phone hacking victims. (Id. ¶¶ 42, 57, 63, 73, 74, 77, 80) The full extent of the illicit practices did not become apparent until July 4, 2011, when it was revealed that News Corp. reporters had hacked into the cell phone of Milly Dowler, a British teenager who disappeared in 2002 and was later found murdered. (Id. ¶¶ 174-75) Plaintiffs allege that the Dowler revelation precipitated a decline in News Corp.'s stock price and scuttled the company's plans to acquire British Sky Broadcasting Limited ("BSkyB"). (Id. ¶¶ 176-86)

Nearly all of the allegedly false statements cited in the Complaint were made by Defendants well before the start of the Class Period (February 15, 2011). (Id. ¶¶ 81-134) For example, the Complaint alleges that Defendants Brooks and Hinton made a number of false and misleading statements in connection with hearings before Parliament that took place between March 2007 and September 2009. (Id. ¶¶ 92-96, 104-05) The Complaint further alleges that Rupert and James Murdoch made similarly false and misleading statements on behalf of News Corp. and NI Group through company press releases, annual shareholder meetings, quarterly conference calls, media interviews, and public speeches – nearly all of which also occurred

3

before the Class Period. (Id. ¶¶ 86, 90-91, 97-102, 131-32, 133-34) Plaintiffs contend that such statements are actionable because they "remained alive" during the Class Period and Defendants had a duty to correct them "before the first day of the Class Period." (Id. at 31, ¶ 140)

## DISCUSSION

"Before addressing Defendants' Rule 12(b)(6) motion to dismiss, the Court must first address the preliminary question[] of . . . personal jurisdiction." Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (citing Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant – a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim.")).

### I. PERSONAL JURISDICTION

#### A. Legal Standard

"The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss." Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001). Prior to discovery, a plaintiff may carry this burden "'by pleading in good faith . . . legally sufficient allegations of jurisdiction, i.e., by making a "prima facie showing" of jurisdiction.'" Whitaker, 261 F.3d at 208 (quoting Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir. 1998) (quoting Ball v. Metallurgie Hoboken–Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990))). "A district court has 'broad discretion' in deciding such a motion, including the discretion to conduct an evidentiary hearing if the Court believes one is warranted." Realuyo v. Villa Abrille, 01 CIV. 10158(JGK), 2003 WL 21537754, at *2 (S.D.N.Y. July 8, 2003) aff'd sub nom. Realuyo v. Abrille, 93 F. App'x 297 (2d Cir. 2004) (quoting CutCo Indus. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986)).

### B. <u>Analysis</u>

"The Exchange Act permits the exercise of personal jurisdiction 'to the limit of the Due Process Clause of the Fifth Amendment.'" <u>S.E.C. v. Compania Internacional Financiera S.A.</u>, 11 CIV 4904 DLC, 2011 WL 3251813, at *4 (S.D.N.Y. July 29, 2011) (quoting <u>S.E.C. v. Unifund SAL</u>, 910 F.2d 1028, 1033 (2d Cir. 1990)). "'The due process test for personal jurisdiction has two related components: the "minimum contacts inquiry" and the "reasonableness" inquiry.'" <u>Id.</u> (quoting <u>Metro. Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 567 (2d Cir. 1996)).

"Under the minimum contacts analysis, contacts with the forum may confer two types of jurisdiction – specific and general." <u>In re Parmalat Sec. Litig.</u>, 376 F. Supp. 2d 449, 453 (S.D.N.Y. 2005) ("<u>Parmalat I</u>"). "Specific jurisdiction exists when a forum 'exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" <u>Id.</u> (quoting <u>Metropolitan Life Ins. Co.</u>, 84 F.3d at 567-68 (internal quotation marks and citation omitted)). General jurisdiction "'is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts.'" <u>Id.</u> (quoting same).

"To support specific jurisdiction over a defendant based upon his or her conduct outside the United States, minimum contacts analysis will be satisfied (1) if those acts caused effects in the United States (2) that were the direct and foreseeable result of the actions abroad and (3) if the defendant knew or had good reason to know that the actions would have effects in the United States." <u>S.E.C. v. Dunn</u>, 587 F. Supp. 2d 486, 509 (S.D.N.Y. 2008). "'[T]he principal inquiry . . . is whether the defendant's activities manifest an intention to submit to the

5

power of a sovereign." Compania Internacional, 2011 WL 3251813, at * 5 (quoting J. McIntyre Machinery, Ltd. v. Nicastro, __ U.S. __, 131 S.Ct. 2780, 2788 (2011)). "In other words, it is essential in each case that there be some act by which the defendant 'purposefully avail[s] itself of the privilege of conducting activities' within the United States, thus 'invoking the benefits and protections of its laws.'" Id. (quoting J. McIntyre Machinery, 131 S.Ct. at 2788).

1. **NI Group**

NI Group is News Corp.'s primary U.K. subsidiary, and the immediate parent company of News Group Newspapers Limited ("NGN"). NGN is the publisher of several newspapers, including The Sun, and is the former publisher of the now-defunct News of the World. The newspapers that NGN publishes are accessible on the Internet, and the newspapers' websites derive five to fifteen percent of their traffic from the United States. NI Group also regularly solicits advertising from U.S. companies through NGN and its newspapers. (Cmplt. ¶ 24)

NI Group argues that Plaintiffs have not pled facts sufficient to demonstrate that it has the necessary minimum contacts with this forum to justify the exercise of personal jurisdiction. (Def. Br. (Dkt. No. 47) at 34) As to the company's purported solicitation of U.S.-based advertisers, and U.S. access to the websites of NGN newspapers, NI Group argues that such generic allegations – without more – do not give rise to general jurisdiction. (Id. at 35-36 (citing, inter alia, Jazini, 148 F.3d at 184 (noting that "presence of [a] subsidiary alone does not establish the parent's presence in the state"); Bensusan Rest. Corp. v. King, 937 F. Supp. 295, 301 (S.D.N.Y. 1996) (noting that operation of a website "may be felt nationwide – or even worldwide – but, without more, it is not an act purposefully directed toward the forum state"); Realuyo, 2003 WL 21537754, at *4 (foreign corporation's sale of advertising space on its website to New York advertising company insufficient to confer personal jurisdiction)).

6

"A state may assert general jurisdiction over a corporation if the corporation has maintained 'continuous and systematic general business contacts' with that forum." In re Parmalat Sec. Litig., 381 F. Supp. 2d 283, 289 (S.D.N.Y. 2005) ("Parmalat II") (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984)).  Here, Plaintiffs argue that such jurisdiction is proper based on allegations that News Corp., which is based in New York, dominates and controls NI Group.  (Pltf. Opp. Br. (Dkt. No. 49) at 43)

In Parmalat II, Judge Kaplan found general jurisdiction was adequately pled as to the U.K. subsidiary of Bank of America where plaintiff alleged, inter alia, that (1) the subsidiary's "'finances, policies and business practices . . . were dominated, controlled and directed by the Bank of America entities and their officers and employees headquartered in North Carolina;'" (2) Bank of America maintained "'an integrated global operation;'" (3) Bank of America reported revenue as a "consolidated figure;" and (4) the subsidiary had "played supporting roles . . . in several of the international financial transactions at issue [in the case]."[4] (Id. at 286 (quoting and citing Parmalat Cmplt. ¶¶ 28, 218, 224, 78-87, 112-30, 131-41, 188-94)).

Here – in contrast to Parmalat II and Perkins – the Complaint contains only vague and conclusory allegations about NI Group's relationship with News Corp.  The Complaint alleges, for example, that Rupert Murdoch's "unfettered control over NewsCorp's operations permitted him to pack its Board of Directors – and the boards of important subsidiaries like [NI Group] – with friends, family members and close associates." (Id. ¶ 5)  Plaintiffs also claim that

---

[4] In reaching this conclusion, Judge Kaplan cited the Supreme Court's decision in Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437 (1952). The Perkins Court found that a mining company was properly served with a summons in Ohio, even though its mining properties were all located in the Philippines. The Court reached this conclusion because the company's president had relocated to Ohio, where he "ran the company's business, kept its files, conducted correspondence, held directors' meetings, drew checks in favor of himself and his secretaries, and dispatched funds to purchase machinery for the rehabilitation of the properties in the Philippines." Parmalat II, 381 F. Supp. 2d at 290 (citing Perkins, 342 U.S. at 447-48).

7

Rupert Murdoch "maintained his control over NewsCorp's U.K. operations, including [NI Group], by appointing close personal friends, family members and other long-term confidants – including Brooks, Hinton, and his son, James – to positions of power where they could do his bidding and serve as his eyes and ears."[5] (Id. ¶ 31) Assuming the truth of these allegations, they are not sufficient to establish that this Court has general jurisdiction over NI Group. Unlike the allegations in Parmalat II or Perkins, Plaintiffs' claims here say nothing about the business relationship between News Corp. and NI Group.

Plaintiffs argue, however, that the acts of News Corp. can be attributed to NI Group for jurisdictional purposes. (Pltf. Opp. Br. (Dkt. No. 49) at 43) A court may impute the jurisdictional acts of a parent to its subsidiary where "the subsidiary is acting as an agent for the parent, or the parent's control is so complete that the subsidiary is a 'mere department' of the parent." Irwin v. ZDF Enterprises GmbH, 04 CIV. 8027 (RWS), 2006 WL 374960, at *8 (S.D.N.Y. Feb. 16, 2006). "In order to establish that a subsidiary is a 'mere department' of the parent, a plaintiff must show that the parent exerts 'pervasive control over the subsidiary.'" Id. at *9 (quoting Jazini, 148 F.3d at 185). Here, however, the Complaint is devoid of facts demonstrating the business relationship between News Corp. and NI Group. Instead, Plaintiffs offer vague and conclusory allegations that Rupert Murdoch appoints individuals who will "do

---

[5] James Murdoch was NI Group's Executive Chairman between December 2007 and March 2011, and he served as an NI Group director from April 2008 to September 2011. (Cmplt. ¶ 26) In their opposition brief, Plaintiffs assert that James Murdoch moved to New York in March 2011, "where he continued to oversee [NI Group's] operations." (Pltf. Opp. Br. (Dkt. No. 49) at 43) The press release cited by Plaintiffs, however, merely states that James Murdoch will "maintain direct responsibility for the Company's [i.e., News Corp.'s] operations in Europe and Asia." (Id. ¶ 149)

his bidding and serve as his eyes and ears." (Id. ¶ 31) This is not sufficient to make out a prima facie showing of jurisdiction as to NI Group.[6]

NI Groups' motion to dismiss for lack of personal jurisdiction will be granted.

### 2. Brooks

Brooks likewise argues that the Complaint does not plead sufficient facts to support this Court's exercise of personal jurisdiction over her. Brooks, the former editor of the News of the World and The Sun, served as CEO of NI Group from June 2009 to July 15, 2011, and as a director from July 23, 2009 to August 8, 2011. (Cmplt. ¶ 28) Along with seven other NI Group employees, she has been charged with criminal offenses in relation to the phone hacking scandal. (Id. ¶ 15) In addition to claiming that the Complaint is facially deficient, Brooks notes that it would be "unfair to conclude that [she] . . . should have foreseen being sued individually in the U.S.," given that "there is no allegation that [she] committed any particular act in the U.S. that damaged Plaintiffs." (Brooks Br. (Dkt. No. 58) at 5)

Plaintiffs concede that the Complaint does not plead sufficient facts to warrant the exercise of general jurisdiction over Brooks. (Pltf. Opp. Br. (Dkt. No. 61) at 9) Plaintiffs argue, however, that specific jurisdiction exists because Brooks should have known that her false statements would directly harm U.S. investors. (Id.) The Complaint does not include sufficient factual allegations to support Plaintiff's theory of specific jurisdiction, however.

The Complaint attributes the following statements to Brooks:

---

[6] Plaintiffs also argue that specific jurisdiction over NI Group exists because "some of the misrepresentations alleged here were made on [NI Group's] behalf in the U.S. by the Murdochs and Hinton." (Pltf. Opp. Br. (Dkt. No. 49) at 42) That argument fails because nearly all of the statements Plaintiffs cite in support of this argument are not attributed to NI Group in the Complaint and/or are not actionable because they pre-date the Class Period.

- on July 10, 2009, Brooks sent a letter to Parliament – which later became public – in which she asserted that a <u>Guardian</u> article about the phone hacking and bribery scandal "substantially and likely deliberately misled the British public" (Cmplt. ¶¶ 69, 104);

- she "directed" the purportedly false 2009 Parliamentary testimony of two NI Group lawyers (<u>Id.</u> ¶ 108); and

- Brooks sent an April 11, 2011 letter to Parliament that "continued defendants' efforts to downplay" an April 8, 2011 press release in which NI Group indicated it would admit liability and pay settlements in several civil lawsuits. (<u>Id.</u> ¶ 155).

These statements, all of which were made in the U.K., are insufficient to demonstrate that Brooks purposely directed her activities towards the U.S., or that it was reasonably foreseeable to her that her statements would be relied on by U.S. investors.

Plaintiffs also assert that NI Group press releases are attributable to Brooks, because she "authorized (and likely helped write)" them. (<u>See</u> Pltf. Opp. Br. (Dkt. No. 61) at 4, 6-7) The Complaint does not contain this allegation, however. Indeed, the Complaint says nothing about who created the press releases. While the Complaint asserts that Brooks "was regularly quoted in press releases" (Cmplt. ¶ 28), it does not allege that she authored them or otherwise controlled their content.

Plaintiffs also contend that there are "[s]triking stylistic and thematic similarities between Brooks' letters, [NI Group's] press releases, and the statements read at the outset of false testimony provided by [NI Group employees] to Parliament," all of which "strongly suggest that Brooks played an important role in drafting, approving and disseminating all of these statements." (Pltf. Opp. Br. (Dkt. No. 61) at 4-5 (citing Cmplt. ¶¶ 100-101, 104, 109)) Again, the Complaint does not contain these allegations. <u>See</u> <u>Southwick Clothing LLC v. GFT (USA) Corp.</u>, No. 99 CV 10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the

motion."). The conclusory allegation in Plaintiffs' opposition brief that Brooks "played an instrumental role" in the misstatements of others likewise does not salvage Plaintiffs' specific jurisdiction argument. (Pltf. Opp. Br. (Dkt. No. 61) at 11)

Specific jurisdiction based on conduct that takes place overseas is only warranted where the domestic effects of a defendant's conduct "occur[] as a direct and foreseeable result of the conduct outside the territory." Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1341 (2d Cir. 1972), abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010). In Leasco, "[t]he Second Circuit rejected the contention that the minimal contacts test could be satisfied on the basis that it would have been generally foreseeable that a prospective buyer, in the event of a proposed sale of the company, would rely on . . . financial statements [certified by the company's accounting firm.]" Parmalat I, 376 F. Supp. 2d at 456. It is precisely this type of allegation that the Complaint levels against Brooks – i.e. that it was "generally foreseeable" to Brooks that News Corp. investors would rely on her statements regarding the phone hacking and bribery scandal.

Plaintiffs also suggest that specific jurisdiction exists because Brooks engaged in a conspiracy to defraud U.S. investors. (Pltf. Opp. Br. (Dkt. No. 61) at 9 (citing Allstate Life Ins. Co. v. Linter Grp. Ltd., 782 F. Supp. 215, 220-21 (S.D.N.Y. 1992)). "[T]o establish jurisdiction on a conspiracy theory, a plaintiff must: (1) make a prima facie factual showing of a conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) show that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in this jurisdiction." Allstate Life Ins. Co., 782 F. Supp. at 221. No such conspiracy claim has been pled in the Complaint.

11

Plaintiffs have not pled sufficient facts to support this Court's exercise of personal jurisdiction over Brooks. Accordingly, her motion to dismiss for lack of personal jurisdiction will be granted.

### 3. Jurisdictional Discovery

Plaintiffs claim that they are "entitled" to jurisdictional discovery in the event that this Court dismisses the Complaint as to NI Group or Brooks on personal jurisdiction grounds. (Pltf. Opp. Br. (Dkt. No. 49) at 44) The contention that Plaintiffs have an automatic right to such discovery is incorrect as a matter of law. See Best Van Lines, Inc. v. Walker, 490 F.3d 239, 255 (2d Cir. 2007) (holding that district court was "well within its discretion in declining to permit discovery because the plaintiff had not made out a prima facie case for jurisdiction"); Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 186 (2d Cir. 1998) (district court did not err in denying jurisdictional discovery where plaintiffs had not established a prima facie case that the district court had jurisdiction over the defendant). Where a plaintiff has not made a prima facie showing of personal jurisdiction, a court has discretion to order jurisdictional discovery if it concludes that plaintiff might be able to establish jurisdiction if given the opportunity to develop a factual record. See, e.g., In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003) (jurisdictional discovery appropriate where plaintiff had offered evidence of defendants' participation in an antitrust conspiracy that could have affected prices in the United States); see also APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (upholding district court decision denying additional jurisdictional discovery and dismissing action; "district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction") (internal quotation marks and citation omitted).

12

Here, there is no need to resolve this issue because – as explained below – the Complaint will be dismissed as to all Defendants for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## II. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A. Legal Standard

"To survive a motion to dismiss, a claim must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled if it merely "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555), or if it does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

### B. The Pre-Class Period Statements Are Not Actionable

As noted above, nearly all of the purportedly false statements cited in the Complaint were made prior to the start of the Class Period. While Plaintiffs argue that Defendants are liable for these statements on a duty to correct theory, Defendants contend that

such statements are not actionable under Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153-54 (2d Cir. 2007). This Court concludes that, under Lattanzio, statements that pre-date the Class Period are not actionable. Plaintiffs do not contend that the few allegedly false statements in the Complaint that remain are sufficient to plead a cause of action. Accordingly, Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) will be granted.

Lattanzio involved, inter alia, allegations that the defendant – a corporation's outside accounting firm – had made false statements concerning the corporation's financial condition in a Form 10-K filed three months prior to the start of the relevant class period. Lattanzio, 476 F.3d at 153-54. Plaintiffs claimed the accounting firm had a continuing duty to correct the misstatements. Id. at 153. The Second Circuit disagreed, holding that "'[a] defendant . . . is liable only for those statements made during the class period.'" Id. (quoting In re IBM Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998)) (alterations in original). The Second Circuit further explained that a plaintiff cannot "surmount this hurdle" by arguing that a defendant has a "duty to correct" misstatements that "extend[] into the Class Period." Id. at 153-54.

The court reasoned that such a duty, if it exists at all, arises at the moment the defendant learns that the prior statement is untrue. Id. at 154. Accordingly, where, as here, a plaintiff alleges that a defendant learned of, but failed to correct, his, her, or its misstatements prior to the start of the class period, the alleged misstatements are not actionable. Id. (affirming dismissal and holding that since defendant became aware of its false statements before the class period, "it cannot be said that [defendant's] failure to correct constituted a statement made during the Class Period"). The Second Circuit noted that to hold otherwise would require adopting an "endless breach argument," which would permit plaintiffs to circumvent the well-settled rule that defendants are liable "only for those statements made during the class period." Id.

14

Lower courts in this District have interpreted Lattanzio as barring securities fraud claims where, as here, they are premised on knowingly false statements made prior to the Class Period. For example, in In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 254 (S.D.N.Y. 2007), Judge Cote cited Lattanzio in support of her ruling that two corporate officers could not be held liable based on a duty to correct theory. As Judge Cote explained, "Plaintiff claims that [defendants] knew the financial statements to be untrue at the time they signed them. Because these statements were made before the class period, plaintiff cannot hold [defendants] liable on the theory that they are in 'endless breach' of some duty to correct." Id. Similarly, as Judge Lynch has noted, "[a]lthough pre-class-period statements can be relevant for showing whether defendants had knowledge that their later statements were false, those statements cannot themselves give rise to liability." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 643 (S.D.N.Y. 2007) (internal citation omitted).

Plaintiffs concede that "Lattanzio . . . bars claims where a defendant discovers the falsity of its statement prior to the Class Period, such that its duty to correct the misrepresentations arose before the Class Period commenced." (Pltf. Opp. Br. (Dkt. No. 49) at 16) They argue, however, that Lattanzio does not bar any claims against News Corp., because News Corp.'s Board of Directors first learned about the company's fraudulent statements at a board meeting on February 15, 2011, the first day of the Class Period. (Id.) Plaintiffs also argue that Lattanzio is "incorrectly decided" and should be confined to its "fact-specific context," because it conflicts with binding Supreme Court and Second Circuit precedent. (Id. at 17-20) Neither argument is persuasive.

Plaintiffs' assertion that News Corp. was not aware of its duty to correct misstatements until February 15, 2011, is belied by the Complaint's factual allegations. The

15

Complaint alleges that numerous intentionally false statements were made by, and on behalf of, News Corp. prior to the start of the Class Period. Moreover, as Plaintiffs acknowledge, "[t]he scienter of the four individual defendants is plainly imputable to both [NI Group] and NewsCorp by reason of their positions as officers and directors of those entities." (Id. (citing Cmplt. ¶¶ 24-28; Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F. 3d 190, 195-96 (2d Cir. 2008); In re LaBranche Sec. Litig., 405 F. Supp. 2d 333, 362 (S.D.N.Y. 2005))). There are many allegations throughout the Complaint that each of the individual defendants knew that their statements were false at the time they were made.

Plaintiffs' argument that Lattanzio was "incorrectly decided" requires little discussion. A district court is "'bound by the decisions of [Second Circuit] panels until such time as they are overruled either by an en banc panel of [the Second Circuit] or by the Supreme Court.'" Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 488 (2d Cir. 2011) (quoting United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004)). As Judge Lynch has noted, the "Second Circuit has spoken clearly on this question." In re Refco, 503 F. Supp. 2d at 643 n.27.

In sum, knowingly false or misleading statements made prior to the Class Period are not actionable. Because the remaining alleged false statements in the Complaint are not sufficient to support a cause of action, Defendants' motion to dismiss for failure to state a claim will be granted.

### C. Leave to Amend

Plaintiffs have requested leave to amend in the event that this Court finds that knowingly false or misleading statements made prior to the Class Period are not actionable. (Pltf. Br. (Dkt. No. 49) at 19-20) "[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended

16

complaint." Van Buskirk v. N.Y. Times Co., 325 F.3d 87, 91 (2d Cir. 2003) (citing Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)). "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).

Defendants have not pointed to any compelling reason why leave to amend should be denied here. Accordingly, Plaintiffs will be granted leave to amend.[7]

## CONCLUSION

For the reasons stated above, Defendants Brooks and NI Group's motions to dismiss under Fed. R. Civ. P. 12(b)(2) are granted. Defendants' motions to dismiss for failure to state a claim are also granted. Plaintiffs will file any Amended Complaint by April 30, 2014. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 46, 57, and 63).

Dated: New York, New York
       March 31, 2014

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[7] This Court expresses no opinion as to the merits of Defendants' remaining arguments. To the extent other deficiencies in the Complaint exist, Plaintiffs should use this opportunity to address them, as further leave to amend is not likely to be granted.