UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEWIS WILDER, as Trustee for the Lewis
Wilder Revocable Trusts, 12/10/2010, and
IROW WORKERS LOCAL UNION NO. 17
PENSION FUND,

                    Plaintiffs,

          and

AVON PENSION FUND, administered by
Bath and North East Somerset Council,
Individually and on Behalf of All Others
Similarly Situated,

                    Lead Plaintiff,

          vs.

NEWS CORPORATION, NI GROUP LTD.,
K. RUPERT MURDOCH, JAMES
MURDOCH, LES HINTON and REBEKAH
BROOKS,

                    Defendants.

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 10 7 15 |

**MEMORANDUM
OPINION & ORDER**

11 Civ. 4947 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          The Avon Pension Fund ("Avon") brings this action as lead plaintiff on behalf of

a putative class that purchased News Corporation ("News Corp.") stock between July 8, 2009

and July 18, 2011 (the "Class Period").[1] (Consolidated Second Amended Class Action

_____

[1] On June 5, 2012, this Court appointed Avon, a pension fund located in the United Kingdom, as
lead plaintiff in this action. (Dkt. No. 31)  Avon claims to have purchased shares of News Corp.
common stock during the Class Period, and to have suffered losses as a result of the alleged
federal securities laws violations committed by Defendants. (SAC ¶ 21)  The Iron Workers
Local Union No. 17 Pension Fund, an Ohio-based pension fund that also claims to have
purchased News Corp. common stock during the Class Period, has joined this action as a named

Complaint (Dkt. No. 71) ¶ 1)  News Corp. is a New York-based worldwide media conglomerate whose stock is listed and publicly traded on the NASDAQ exchange.  (Id. ¶¶ 2, 23)  Plaintiffs allege that Defendants deliberately concealed information regarding illegal news-gathering practices at two News Corp. newspapers – The Sun and the now-defunct News of the World – and that the eventual public revelation of these practices harmed investors by causing News Corp.'s stock price to plummet.  (Id. ¶¶ 3-5, 10-14)  Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act against News Corp., its wholly-owned United Kingdom subsidiary NI Group Limited ("NI Group"),[2] and four of the companies' officers and directors – K. Rupert Murdoch, James Murdoch, Les Hinton, and Rebekah Brooks.  (Id. ¶¶ 200-215)

On March 31, 2014, this Court granted Defendants' motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint"), finding that the Court lacked personal jurisdiction over Defendants NI Group and Brooks, and that the Amended Complaint failed to state a claim upon which relief could be granted.[3]  Wilder v. News Corporation, No. 11 Civ. 4947 (PGG), 2014 WL 1315960 (S.D.N.Y. Mar. 31, 2014) (Dkt. No. 69).  On April 30, 2014, Plaintiffs filed the Consolidated Second Amended Class Action Complaint (the "SAC").  (Dkt. No. 71)

Defendants NI Group and Brooks have again moved to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and all Defendants have moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[4]

---

plaintiff.  (Id. ¶ 22)

[2] Defendant NI Group was formerly known as News International Limited.  (Id. ¶ 1)

[3] Familiarity with the March 31, 2014 Memorandum Opinion and Order is presumed.

[4] Corporate Defendants News Corp. and NI Group, together with individual defendants Rupert and James Murdoch, have filed a joint motion to dismiss (Dkt. No. 99).  Defendants Brooks

2

On September 30, 2015, this Court granted Defendants' motions to dismiss. (Dkt. No. 121)  The purpose of this opinion is to explain the Court's reasoning.

## BACKGROUND

### I.    FACTUAL BACKGROUND

This action arises from Defendants' purported scheme to conceal the existence and extent of illegal news-gathering practices at the News of the World and The Sun.  Evidence of those practices first came to light in 2006, when police arrested News of the World reporter Clive Goodman and investigator Glenn Mulcaire on suspicion of hacking the phones of royal family members. (SAC ¶¶ 53-54)  The ensuing investigation suggested rampant phone hacking by News of the World employees. (Id. ¶¶ 56-57)  The police conveyed their concerns privately to NI Group and Brooks, but – aside from terminating Goodman and Mulcaire – no further action was taken by NI Group, News Corp., or the police. (Id. ¶¶ 57-58)

Goodman and Mulcaire were prosecuted and eventually sentenced to prison for their crimes.  Defendants, meanwhile, repeatedly assured the public and News Corp. investors that the phone hacking was an isolated incident limited to one rogue reporter. See, e.g., id. ¶¶ 6-7, 54, 83, 89, 105-12, 120.  It has since been revealed, however, that reporters at the News of the World and The Sun routinely hacked the phones of celebrities and other public figures, and paid bribes to government officials to acquire sensitive information.  Details of these misdeeds emerged gradually as a result of several lawsuits filed by phone hacking victims. (Id. ¶¶ 7-13, 72-79)  The full extent of the illicit practices did not become apparent until July 4, 2011, when it was revealed that News Corp. reporters had hacked into the cell phone of Milly Dowler, a British teenager who disappeared in 2002 and was later found murdered. (Id. ¶¶ 11, 177-79)  Plaintiffs

---

(Dkt. No. 102) and Hinton (Dkt. No. 104) have each moved separately.

allege that the Dowler revelation precipitated a decline in News Corp.'s stock price and scuttled the company's plans to acquire British Sky Broadcasting Limited ("BSkyB"). (Id. ¶¶ 14, 177-92)

## II.   PROCEDURAL BACKGROUND

### A.   This Court's Dismissal of the Amended Complaint

The Amended Complaint was filed on July 31, 2012. (Dkt. No. 33) Defendants filed motions to dismiss the Amended Complaint (1) for lack of personal jurisdiction as to NI Group and Brooks, and (2) for failure to state a claim. (Dkt. Nos. 46, 57, 63) On March 31, 2014, this Court dismissed the Amended Complaint, finding that (1) this Court lacked personal jurisdiction over NI Group and Brooks, and (2) nearly all of the alleged misstatements came prior to the beginning of the alleged Class Period – February 15, 2011 – and were therefore not actionable. Wilder, 2014 WL 1315960.

With respect to personal jurisdiction over NI Group, Plaintiffs argued that jurisdiction was proper based on allegations that News Corp. – which is based in New York – dominates and controls NI Group. This Court found, however, that "the [Amended] Complaint contains only vague and conclusory allegations about NI Group's relationship with News Corp." Id. at *4. The Court also found that the acts of News Corp. could not be attributed to NI Group for jurisdictional purposes, because the allegations of News Corp.'s control over NI Group were conclusory, and the Amended Complaint was "devoid of facts demonstrating the business relationship between News Corp. and NI Group." Id.

With respect to Brooks, this Court found that all of the statements and actions attributed to her in the Amended Complaint "were made in the U.K., [and] are insufficient to demonstrate that Brooks purposely directed her activities towards the U.S. . . ." Id. at *5. This

4

Court also found that Plaintiffs had not sufficiently alleged Brooks's control over or authorship

of certain press releases issued by NI Group in the United States.  Id.  Accordingly, this Court

found that it lacked the authority to exercise personal jurisdiction as to NI Group and Brooks.  Id.

at *6.

        This Court also found that "nearly all of the purportedly false statements cited in

the [Amended] Complaint were made prior to the start of the Class Period" alleged in the

Amended Complaint – February 15, 2011.  Id. at *7.  In its opinion, the Court discussed at length

whether statements that pre-date the Class Period are actionable under Lattanzio v. Deloitte &

Touche LLP, 476 F.3d 147, 153-54 (2d Cir. 2007), and concluded that they are not:

> While Plaintiffs argue that Defendants are liable for these statements on a duty to
> correct theory, Defendants contend that such statements are not actionable under
> Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153-54 (2d Cir. 2007).  This
> Court concludes that, under Lattanzio, statements that pre-date the Class Period
> are not actionable.  Plaintiffs do not contend that the few allegedly false
> statements in the [Amended] Complaint that remain are sufficient to plead a cause
> of action.  Accordingly, Defendants' motion to dismiss under Fed. R. Civ. P.
> 12(b)(6) will be granted.
>
> Lattanzio involved, inter alia, allegations that the defendant – a corporation's
> outside accounting firm – had made false statements concerning the corporation's
> financial condition in a Form 10-K filed three months prior to the start of the
> relevant class period.  Lattanzio, 476 F.3d at 153-54.  Plaintiffs claimed the
> accounting firm had a continuing duty to correct the misstatements.  Id. at 153.
> The Second Circuit disagreed, holding that "'[a] defendant . . . is liable only for
> those statements made during the class period.'"  Id. (quoting In re IBM Sec.
> Litig., 163 F.3d 102, 107 (2d Cir. 1998)) (alterations in original).  The Second
> Circuit further explained that a plaintiff cannot "surmount this hurdle" by arguing
> that a defendant has a "duty to correct" misstatements that "extend[] into the
> Class Period."  Id. at 153-54.
>
> The court reasoned that such a duty, if it exists at all, arises at the moment the
> defendant learns that the prior statement is untrue.  Id. at 154.  Accordingly,
> where, as here, a plaintiff alleges that a defendant learned of, but failed to correct,
> his, her, or its misstatements prior to the start of the class period, the alleged
> misstatements are not actionable.  Id. (affirming dismissal and holding that since
> defendant became aware of its false statements before the class period, "it cannot
> be said that [defendant's] failure to correct constituted a statement made during
> the Class Period").  The Second Circuit noted that to hold otherwise would

require adopting an "endless breach argument," which would permit plaintiffs to circumvent the well-settled rule that defendants are liable "only for those statements made during the class period." Id.

Lower courts in this District have interpreted Lattanzio as barring securities fraud claims where, as here, they are premised on knowingly false statements made prior to the Class Period. For example, in In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 254 (S.D.N.Y. 2007), Judge Cote cited Lattanzio in support of her ruling that two corporate officers could not be held liable based on a duty to correct theory. As Judge Cote explained, "Plaintiff claims that [defendants] knew the financial statements to be untrue at the time they signed them. Because these statements were made before the class period, plaintiff cannot hold [defendants] liable on the theory that they are in 'endless breach' of some duty to correct." Id. Similarly, as Judge Lynch has noted, "[a]lthough pre-class-period statements can be relevant for showing whether defendants had knowledge that their later statements were false, those statements cannot themselves give rise to liability." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 643 (S.D.N.Y. 2007) (internal citation omitted).

Id. at *7-8. Accordingly, this Court ruled that the "knowingly false or misleading statements made prior to the Class Period [beginning on February 15, 2011] are not actionable. Because the remaining alleged false statements in the [Amended] Complaint are not sufficient to support a cause of action, Defendants' motion to dismiss for failure to state a claim will be granted." Id. at *9. The Court granted Plaintiffs leave to amend. Id.

## B.   The Second Amended Complaint

On April 30, 2014, Plaintiffs filed the SAC. (Dkt. No. 71) The SAC pleads a July 8, 2009 start date for the Class Period, as opposed to the February 15, 2011 start date alleged in the Amended Complaint. See SAC ¶ 1. As a result of this change, Defendants' alleged misstatements now fall within the Class Period. (Id.; see also Pltf. News Corp. Opp. (Dkt. No. 107) at 1-2)

The SAC also contains additional allegations regarding the relationship between NI Group and News Corp. for purposes of establishing personal jurisdiction over NI Group. See SAC ¶¶ 30-39; see also Pltf. News Corp Opp. (Dkt. No. 107) at 1-2. As to Brooks, the SAC

6

contends that she directed the drafting, approval, and dissemination of statements issued via

News Corp.'s website, based on alleged similarities between the statements and certain letters

known to have been authored by Brooks.  See SAC ¶ 113; see also Pltf. Brooks Opp. (Dkt. No.

108) at 4-5.  The SAC is otherwise essentially identical to the Amended Complaint.  See Musoff

Decl. (Dkt. No. 101) Ex. BB (comparison of Amended Complaint and SAC).  As in the

Amended Complaint, nearly all of the alleged misstatements upon which Plaintiffs' securities

fraud claims are based were made before February 15, 2011.

On November 21, 2014, Defendants NI Group and Brooks again moved to

dismiss for lack of personal jurisdiction.  (Dkt. Nos. 99, 102; see Def. Brs. (Dkt. Nos. 100, 103))

All Defendants have also moved to dismiss for failure to state a claim, arguing, inter alia, that the

expanded Class Period set forth in the SAC is barred by the two-year statute of limitations for

private securities fraud actions.  (Def. Brs. (Dkt. Nos. 100, 103, 105))  Defendants argue that

although the start date for the Class Period was moved back to July 8, 2009 – meaning that

Defendants' alleged misstatements now fall within the Class Period – claims based on statements

made prior to February 15, 2011 – the start date of the Class Period alleged in the Amended

Complaint – are now time-barred.  Defendants further contend that because all of the alleged

misstatements made between July 8, 2009 and February 15, 2011 are not actionable, the SAC

must be dismissed for the same reasons that this Court dismissed the Amended Complaint.  See

id.

## DISCUSSION

## I.    LEGAL STANDARD ON MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the

complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning

Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of

the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507

F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "In considering a motion to

dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the

facts alleged in the complaint, documents attached to the complaint as exhibits, and documents

incorporated by reference in the complaint." DiFolco, 622 F.3d at 111 (citing Chambers v. Time

Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. Of Nassau, 180 F.3d 42, 54 (2d

Cir. 1999)).

## II.  PERSONAL JURISDICTION

Defendants NI Group and Brooks argue that this Court lacks personal jurisdiction

over them. (NI Group Br. (Dkt. No. 100); Brooks Br. (Dkt. No. 103)) "Jurisdiction to resolve

cases on the merits requires . . . authority . . . over the parties (personal jurisdiction), so that the

court's decision will bind them." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577 (1999).

Accordingly, before considering Defendants' Rule 12(b)(6) motion to dismiss, this Court must

determine whether it may exercise  personal jurisdiction over NI Group and Brooks.

8

## A.   Legal Standard

"The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss." Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001). Prior to discovery, a plaintiff may carry this burden "'by pleading in good faith . . . legally sufficient allegations of jurisdiction, i.e., by making a "prima facie showing" of jurisdiction.'" Whitaker, 261 F.3d at 208 (quoting Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir. 1998) (quoting Ball v. Metallurgie Hoboken–Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990))). "A district court has 'broad discretion' in deciding such a motion . . . ." Realuyo v. Villa Abrille, No. 01 Civ. 10158 (JGK), 2003 WL 21537754, at *2 (S.D.N.Y. July 8, 2003), aff'd sub nom. Realuyo v. Abrille, 93 F. App'x 297 (2d Cir. 2004) (quoting CutCo Indus. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986)).

"The Exchange Act permits the exercise of personal jurisdiction 'to the limit of the Due Process Clause of the Fifth Amendment.'" S.E.C. v. Compania Internacional Financiera S.A., No. 11 Civ. 4904 (DLC), 2011 WL 3251813, at *4 (S.D.N.Y. July 29, 2011) (quoting S.E.C. v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990)). "'The due process test for personal jurisdiction has two related components: the "minimum contacts inquiry" and the "reasonableness" inquiry.'" Id. (quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996)).

"[C]ontacts with the forum may confer two types of jurisdiction – specific and general." In re Parmalat Sec. Litig., 376 F. Supp. 2d 449, 453 (S.D.N.Y. 2005) ("Parmalat I"). "Specific jurisdiction exists when a forum 'exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" Id. (quoting Metropolitan Life Ins. Co., 84 F.3d at 567-68 (internal quotation marks and citation omitted)).

9

General jurisdiction "'is based on the defendant's general business contacts with the forum . . . and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts.'" Id. (quoting same).

## 1. General Personal Jurisdiction

"A state may assert general jurisdiction over a corporation if the corporation has maintained 'continuous and systematic general business contacts' with that forum." In re Parmalat Sec. Litig., 381 F. Supp. 2d 283, 289 (S.D.N.Y. 2005) ("Parmalat II") (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984)). The Supreme Court has made clear, however, that general jurisdiction may only constitutionally be exercised over a defendant who is "'essentially at home'" in the relevant forum. Daimler AG v. Bauman, 134 S.Ct. 746, 751 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2851 (2011)). "'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.'" Id. at 760 (quoting Goodyear, 131 S.Ct. at 2853-54 (2011)).

In addressing the locales in which a corporation may be "fairly regarded as at home," the Supreme Court has noted that "the place of incorporation and the principal place of business are the 'paradig[m] . . . bases for general jurisdiction.'" Id. (quoting Brilmayer et al., A General Look at General Jurisdiction, 66 Texas L. Rev. 721, 735 (1988)). While it is not the case "that a corporation may be subject to general jurisdiction only in a forum where it is incorporated or has its principal place of business," the corporation must have "'affiliations with the State . . . so "continuous and systematic" as to render [it] essentially at home in the forum State.'" Id. at 761 (quoting Goodyear, 131 S.Ct. at 2851) (emphasis in original). Accordingly,

10

general jurisdiction may only be constitutionally exercised where a corporation is incorporated, has its principal place of business, or, "in an exceptional case," where the corporation maintains other contacts comparable in magnitude and nature. Id. at 761 n.19; see id. at 760 (corporation's place of incorporation and principal place of business "have the virtue of being unique . . . as well as easily ascertainable" so as to "afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims"); id. at 762 (no general jurisdiction in California where defendants were not incorporated in California and each defendant's principal place of business was outside California; authorizing jurisdiction based on in-state sales does not "permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit'" (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985))).

In certain circumstances, a foreign subsidiary of a United States corporation may be subject to general jurisdiction in the United States on the basis of the parent-subsidiary relationship. A court may impute the jurisdictional acts of a parent to its subsidiary where "the subsidiary is acting as an agent for the parent, or the parent's control is so complete that the subsidiary is a 'mere department' of the parent." Irwin v. ZDF Enterprises GmbH, No. 04 Civ. 8027 (RWS), 2006 WL 374960, at *8 (S.D.N.Y. Feb. 16, 2006) (citation and internal quotation marks omitted). "In order to establish that a subsidiary is a 'mere department' of the parent, a plaintiff must show that the parent exerts 'pervasive control over the subsidiary.'" Id. at *9 (quoting Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 185 (2d Cir. 1998)).

The standard for veil-piercing in the personal jurisdiction context is a demanding one, however, and "a Court will only find jurisdiction over the foreign subsidiary when 'the activities of the parent show a disregard for the separate corporate existence of the subsidiary.'"

11

Id. at *8 (quoting Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117,

120 (2d Cir. 1984)).  "[I]n Beech Aircraft, [the Second Circuit] summarized [certain factors

relevant to the veil-piercing analysis] as follows:  first, common ownership . . . ; second,

financial dependency of the subsidiary on the parent corporation; third, the degree to which the

parent corporation interferes in the selection and assignment of the subsidiary's executive

personnel and fails to observe corporate formalities, and fourth, the degree of control over the

marketing and operation policies of the subsidiary exercised by the parent."  Jazini, 148 F.3d at

184-85 (citation and internal quotation marks omitted).

## 2.    Specific Personal Jurisdiction

With respect to specific personal jurisdiction, "[t]he inquiry . . . 'focuses on "the

relationship among the defendant, the forum, and the litigation."'"  Walden v. Fiore, 134 S.Ct.

1115, 1121 (2014) (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984) (quoting

Shaffer v. Heitner, 433 U.S. 186, 204 (1977))).  For this Court "to exercise [specific] jurisdiction

consistent with due process, the defendant's suit-related conduct must create a substantial

connection with the forum state."  Id.

Moreover, "the relationship [between the defendant's suit-related conduct and the

forum] must arise out of contacts that the 'defendant himself' creates with the forum . . . ."  Id. at

1122 (quoting Burger King, 471 U.S. at 475) (emphasis in original).  And the "'minimum

contacts' analysis looks to the defendant's contacts with the forum . . . itself, not the defendant's

contacts with persons who reside there."  Id.  While "a defendant's contacts with the forum . . .

may be intertwined with his transactions or interactions with the plaintiff or other parties," these

relationships, "standing alone, [are] an insufficient basis for jurisdiction."  Id. at 1123.  "Due

process requires that a defendant be haled into court in a forum . . . based on his own affiliation

with the [forum], not based on the 'random, fortuitous, or attenuated' contacts he makes by

interacting with other persons affiliated with the [forum]." Id. (quoting Burger King, 471 U.S. at

475). In this regard, "[t]he proper question is not where the plaintiff experienced a particular

injury or effect but whether the defendant's conduct connects him to the forum in a meaningful

way." Id. at 1125.

   A defendant need not have committed a physical act within the forum state,

however; the test may be satisfied where "an act performed elsewhere[] causes an effect in the

[forum]." Eskofot A/S v. E.I. Du Pont De Nemours & Co., 872 F. Supp. 81, 87 (S.D.N.Y. 1995)

(citing SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990)) (applying minimum contacts

analysis in context of Fed. R. Civ. P. Rule 4(k)(2)). In Walden, the Supreme Court discussed at

length how the effects of a defendant's conduct can tie a defendant sufficiently to a forum to

permit the exercise of personal jurisdiction. Justice Thomas explained that

> [t]he crux of Calder [-- a case finding specific personal jurisdiction in California
> where a Florida-based paper published a defamatory article about a California
> actress –] was that the reputation-based "effects" of the alleged libel connected
> the defendants to California, not just to the plaintiff. The strength of that
> connection was largely a function of the nature of the libel tort. However
> scandalous a newspaper article might be, it can lead to a loss of reputation only if
> communicated to (and read and understood by) third persons. . . . Accordingly,
> the reputational injury caused by the defendants' story would not have occurred
> but for the fact that the defendants wrote an article for publication in California
> that was read by a large number of California citizens. Indeed, because
> publication to third persons is a necessary element of libel, . . . the defendants'
> intentional tort actually occurred in California. . . . In this way, the "effects"
> caused by the defendants' article – i.e., the injury to the plaintiff's reputation in
> the estimation of the California public – connected the defendants' conduct to
> California, not just to a plaintiff who lived there. That connection, combined with
> the various facts that gave the article a California focus, sufficed to authorize the
> California court's exercise of jurisdiction.

Walden, 134 S.Ct. at 1123-24 (emphasis in original) (footnote omitted).

13

In this Circuit, "where 'the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff,'" a court is to employ "an 'effects test,' by which 'the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum.'" Tarsavage v. Citic Trust Co., Ltd., 3 F. Supp. 3d 137, 145 (S.D.N.Y. 2014) (quoting Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 173 (2d Cir. 2013) (citing Calder, 465 U.S. at 789)). It is not sufficient that conduct incidentally had an effect in the forum, or even that effects in the forum were foreseeable. See id. (citing In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 674 (2d Cir. 2013)). Instead, the defendant must have intentionally caused – i.e., expressly aimed to cause – an effect in the forum through his conduct elsewhere. See id. (citing In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 95 (2d Cir. 2008), abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010)).

## B. Analysis

### 1. NI Group

Plaintiffs argue that NI Group is subject to general personal jurisdiction in New York on the basis of its status as a subsidiary of News Corp. (Pltf. News Corp. Opp. (Dkt. No. 107) 44-45) News Corp. maintains its principal place of business in New York (SAC ¶ 23), and is therefore subject to general personal jurisdiction in New York. See Daimler, 134 S.Ct. at 760. Accordingly, if News Corp.'s contacts may be imputed to NI Group, the Court's exercise of personal jurisdiction over NI Group would be appropriate.

Although the SAC alleges a number of ways in which News Corp. is involved with or exerts control over NI Group, the allegations concerning the relationship between News Corp. and NI Group – taken together – do not demonstrate a level of domination and control

14

sufficient to establish that "'the activities of the parent show a disregard for the separate

corporate existence of the subsidiary.'" Irwin, 2006 WL 374960, at *8 (quoting Beech Aircraft,

751 F.2d at 120). With respect to the business relationship between NI Group and News Corp.,

the SAC alleges, inter alia, that

- "There was common and overlapping membership among the Boards of Directors of [NI Group and News Corp.]" (SAC ¶ 34)

- "NewsCorp's financial statements consolidated and included the financial statements of [NI Group] . . . . [and] [NI Group] . . . used [its] status as [a] wholly-owned subsidiar[y] of NewsCorp . . . to claim exemption from requirements to include a cash flow statement or disclose related party transactions in [its] own financial statements." (Id. ¶ 35)

- "NewsCorp was the guarantor of a collective overdraft facility used by [NI Group] . . . and other U.K. subsidiaries [of News Corp.] in connection with shared banking arrangements they used to meet working capital requirements." (Id. ¶ 36)

- "NewsCorp provided financial commitments and guarantees to [NI Group] and the other U.K. subsidiaries . . . to enable the Group to meet its liabilities as they f[ell] due . . . ." (Id. ¶ 37)

- "NewsCorp and the Murdochs . . . (i) appoint[ed] key executives including the CEO and legal manager of [NI Group] . . . [and] (ii) appoint[ed] the editors of News of the World [and] The Sun. . . ." (Id. ¶ 38)

- "The operating budgets for [NI Group] and the U.K. newspapers were each individually approved by NewsCorp in New York City." (Id.)

These allegations do not demonstrate that News Corp. has "disregard[ed] the

separate corporate existence of [NI Group]" or that NI Group is a "mere department" of News

Corp. Irwin, 2006 WL 374960, at *8 (citation and quotation marks omitted).

"The officers of any corporation that owns the stock of another necessarily

exercise a considerable degree of control over the subsidiary corporation and the discharge of

that supervision alone is not enough to subject the parent to New York jurisdiction." Beech

Aircraft, 751 F.2d at 120. Moreover, "the officers of a parent normally control the board of

directors of a subsidiary in their capacity as representatives of the controlling stockholder." Id.

at 121. It is only when "the parent officers extend their control beyond that normally exercised

by boards of directors [that] their behavior supports an inference that the subsidiary is not an

independent entity." Id.

                In Beech Aircraft, the Second Circuit permitted veil-piercing in the personal

jurisdiction context where

> [the subsidiary] East's five member board is comprised of the president, treasurer,
> and a vice president of Beech [the parent] and two officers of East. However, the
> president, treasurer, and a vice-president of Beech occupy the same positions at
> East. Beech pays the entire salaries of the three officers who serve in those
> positions for Beech and East. The highest ranking officer of East who is not also
> an officer of Beech is the vice-president and general manager. An officer of
> Beech stated that it was Beech policy to give the managing officer of all of
> Beech's marketing subsidiaries the rank of vice-president. He asserted that the
> fact that Beech's president was the president of East was a mere formality. This
> explanation . . . indicates that Beech and not East decides which officers of East
> are to be figureheads. Moreover, Beech claimed that its policy of making the
> general managers of its subsidiaries vice-presidents allowed Beech to transfer
> executives among its subsidiaries with ease. . . . In one instance, moreover, Beech
> transferred a Beech officer to handle a difficult real estate transaction for East, an
> act evidencing the limited scope of authority Beech accords to officers of East.

Id. at 121-22.

                Here, unlike in Beech Aircraft, the allegations do not demonstrate that News

Corp.'s control over NI Group's executives and other personnel is so pervasive as to warrant a

finding that the corporate form was disregarded. See id.; ESI, Inc. v. Coastal Corp., 61 F. Supp.

2d 35, 54 (S.D.N.Y 1999) (in analyzing parent's control over executive personnel and whether

parent failed to observe corporate formalities "courts look to, inter alia, whether the parent shares

officers with the subsidiary and shifts executives among its subsidiaries, whether the parent pays

the executives' salaries, and whether the subsidiary holds separate meetings of its Board of

Directors").

Plaintiffs do not allege here that News Corp. assigns and transfers NI Group's officers and managers at will; that it appoints substantially all of NI Group's officers and managers; that it determines the duties and responsibilities of NI Group' officers and managers; or that it pays NI Group's executives' salaries. Instead, Plaintiffs allege that News Corp. appointed NI Group's CEO and legal manager. These facts are not sufficient under Beech Aircraft to demonstrate that News Corp.'s control over NI Group's executives is so pervasive as to require a finding that News Corp. disregarded the corporate form. See SAC ¶ 38. News Corp.'s selection of "the editors of News of the World [and] The Sun" (id.) does not alter the analysis. In the context of a media conglomerate's supervision of a subsidiary newspaper company, such conduct does not "extend [News Corp.'s] control beyond that normally exercised by boards of directors." Beech Aircraft, 751 F.2d at 121. Acknowledging that the SAC also alleges that there is an overlap in the membership of the parent and the subsidiary's boards (see SAC ¶ 34), the SAC's allegations remain insufficient to establish that News Corp. "disregard[ed] the separate corporate existence of [NI Group]." Irwin, 2006 WL 374960, at *8 (citation and quotation marks omitted).

Plaintiffs have also alleged that News Corp. approves the yearly budget for NI Group and provides NI Group with certain financial support. See SAC ¶¶ 34, 37-38. These allegations are not sufficient to demonstrate that NI Group is "financial[ly] dependen[t] . . . on [News Corp]," however. Jazini, 148 F.3d at 184-85.

Finally, Plaintiffs' allegation that News Corp. "exercise[ed] direct control over the editorial policies of NewsCorp's newspapers in the U.K." (SAC ¶ 38) is too vague and conclusory to establish that News Corp.'s "control over the . . . operational policies of [NI Group]" goes beyond the control that a parent company would typically exercise. Beech

Aircraft, 751 F.2d at 122. As this Court noted in dismissing the Amended Complaint, allegations that Rupert Murdoch appoints individuals who will "do his bidding and serve as his eyes and ears" (SAC ¶ 40) are too vague and conclusory to establish the requisite level of domination. See Wilder, 2014 WL 1315960, at *4.

              In sum, Plaintiffs have not demonstrated that News Corp.'s exercise of control over NI Group goes beyond the extent of control that a corporate parent might reasonably be expected to exercise over its subsidiary. To hold that News Corp.'s contacts with New York can be imputed to NI Group would open the door to the exercise of general personal jurisdiction in the United States over many foreign subsidiaries of U.S.-based companies. Such a result would appear to run contrary to the tenor of the Supreme Court's Daimler decision. See Daimler, 134 S.Ct. at 763 ("Other nations do not share the uninhibited approach to personal jurisdiction advanced by the [plaintiffs] in this case. . . . Considerations of international rapport thus reinforce [the] determination that subjecting [a foreign corporation] to general jurisdiction of courts in [New York] would not accord with the 'fair play and substantial justice' due process demands." (citations omitted)).[5]

---

[5] In Parmalat II, the court found that general jurisdiction was adequately pled as to the Bank of America's U.K. subsidiary where plaintiffs alleged, inter alia, that (1) the subsidiary's "'finances, policies and business practices . . . were dominated, controlled and directed by the Bank of America entities and their officers and employees headquartered in North Carolina'"; (2) Bank of America maintained "'an integrated global operation'"; (3) Bank of America reported revenue as a "consolidated figure"; and (4) the subsidiary had "played supporting roles . . . in several of the international financial transactions at issue [in the case]." Parmalat II, 381 F. Supp. 2d at 286 (quoting and citing Parmalat Cmplt. ¶¶ 28, 218, 224, 78-87, 112-30, 131-41, 188-94)). Based on these allegations, the court found that the "management and supervision of the [subsidiary]" "ha[d] been conducted from BoA's headquarters in North Carolina," and that, accordingly, a "'continuous and systematic, but limited part of [the subsidiary's] general business'" had been conducted from BoA's North Carolina headquarters. Id. at 290 (quoting Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 438 (1952)).

18

This Court concludes that Plaintiffs have not alleged facts sufficient to warrant the piercing of the corporate veil for personal jurisdiction purposes. Accordingly, the exercise of general personal jurisdiction over NI Group is not appropriate, and NI Group's motion to dismiss must be granted.[6]

### 2.    Brooks

Brooks likewise argues that this Court lacks personal jurisdiction over her. (Brooks Br. (Dkt. No. 103))  Plaintiffs argue that the exercise of specific personal jurisdiction over Brooks is appropriate because "the SAC now strengthens the inference that Brooks . . . directed the drafting, [and] authorized and disseminated the false and misleading July 9 and 10[, 2009] Press Releases through NewsCorp's United States based website[.]  [In these press releases, Defendants deny wrongdoing in connection with phone-hacking, and it is these

---

After Daimler, however, a finding that a "limited part" of a foreign subsidiary's "general business" had been conducted in the forum state would be insufficient to justify the exercise of general personal jurisdiction over that entity. Daimler, 134 S.Ct. at 760-61 and n.19 (rejecting argument that general jurisdiction may be predicated on evidence that the defendant "corporation 'engages in a substantial, continuous, and systematic course of business'" in the forum state; holding that, other than in an "exceptional case," the exercise of general jurisdiction is limited to a forum which is either a corporation's place of incorporation or its principal place of business); see also Gucci America, Inc. v. Weixling Li, 768 F.3d 122, 134-36 (2d Cir. 2014) ("Aside from 'an exceptional case,' the Court explained, a corporation is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business. [Daimler, 134 S.Ct.] at 761 & n.19.  In so holding, the Court expressly cast doubt on previous Supreme Court and New York Court of Appeals cases that permitted general jurisdiction on the basis that a foreign corporation was doing business through a local branch office in the forum."). Accordingly, Parmalat II does not provide a basis for this Court to exercise general jurisdiction over NI Group.
[6] Plaintiffs also argue that NI Group is subject to specific personal jurisdiction because of "its direct participation in the fraud" occurring in the United States. (Pltf. News Corp. Opp. (Dkt. No. 107) at 45)  Nearly all of the statements upon which Plaintiffs premise their specific jurisdiction arguments were made before February 15, 2011, however.  As discussed below, claims premised on these statements are time-barred.  Accordingly, these statements provide no basis for this Court to exercise specific personal jurisdiction over NI Group.

statements] . . . which give rise to Plaintiffs' claims and trigger the Class Period." (Pltf. Brooks

Opp. (Dkt. No. 108) at 9)

>      With respect to the July 9 and 10, 2009 press releases, the SAC alleges that

- "While [Brooks] was Chief Executive of [NI Group] . . . she was regularly quoted in press releases and regularly spoke on behalf of [NI Group] and NewsCorp, which supports an inference that Brooks either authored or approved such press releases before they were issued. The inference that Brooks drafted or approved press releases and statements regarding phone hacking is even stronger, given: (i) the significance of the Parliamentary, police and other inquiries to defendants' business and reputation; (ii) the significant legal liabilities that faced NewsCorp [and] [NI Group] . . . as a result of those investigations; and (iii) stylistic and thematic similarities between letters and statements she drafted and the contents of the press releases and statements on phone hacking issued by [NI Group] and NewsCorp." (SAC ¶ 28)

- "There are striking stylistic and thematic similarities between Brooks' letters [to Parliament], [NI Group's] press releases, and the statements read at the outset of the false testimony provided by Crone and Myler to Parliament. . . . These similarities strongly suggest that Brooks played an important role in drafting, approving and disseminating all of these statements." (Id. ¶ 113)

>      The SAC also alleges that

- Brooks participated in the settlement negotiations with a phone hacking victim to prevent him from compelling another individual to testify before Parliament (id. ¶¶ 38, 82);

- Brooks referred to the British newspaper News of the World as a toxic asset, jeopardizing News Corp.'s bid to acquire BSkyB and risking harm to News Corp.'s reputation (id. ¶¶ 9-10, 148-50, 166); and

- Brooks traveled to News Corp.'s United States headquarters annually to obtain approval of NI Group's budget. (Id. ¶ 38; see also Ptlf. Brooks Opp. (Dkt. No. 108) at 10)

>      As an initial matter, it is irrelevant that Brooks traveled to the United States to

discuss NI Group's budget, because Plaintiffs do not allege that these discussions relate in any

way to the conduct underlying the instant case. Only a defendant's "suit-related conduct" may

be used to establish the requisite minimum contacts for specific personal jurisdiction. Walden,

134 S.Ct. at 1121.

In their brief opposing Brooks' motion to dismiss, Plaintiffs also argue that

Brooks "helped draft, authorize and disseminate the July 9 and July 10, 2009 press releases

issued by [NI Group] and NewsCorp from its United States based website." (Pltf. Brooks Opp.

(Dkt. No. 108) at 10 (citing SAC ¶¶ 28, 113))  The SAC does not set forth direct evidence that

Brooks was involved in drafting, authorizing, or disseminating the July 9 and 10, 2009 press

releases posted on News Corp.'s website, however.  See SAC, ¶¶ 7(b), 109.  Instead, the SAC

contends that Brooks' participation can be inferred from the fact that

1.  Brooks "was regularly quoted in press releases and regularly spoke on behalf of [NI Group] and News Corp";

2.  the allegations discussed in the press releases were significant to NI Group and News Corp., given the Parliamentary and police investigations, and "the significant legal liabilities" that these entities faced; and

3.   there are "striking stylistic and thematic similarities" between a July 10, 2009 letter that Brooks sent to Parliament and the News Corp. press releases.

(SAC ¶¶ 28, 113)

None of these allegations is sufficient to raise "above a speculative level"

Plaintiffs' contention that Brooks drafted, reviewed, authorized and/or disseminated the News

Corp. press releases.  Twombly, 550 U.S. at 555.  Plaintiffs have not alleged that NI Group or

News Corp. attributed the press releases to Brooks, nor have Plaintiffs pleaded facts

demonstrating that it was Brooks' job to draft, review, authorize, or disseminate press releases

concerning NI Group that were posted on News Corp.'s website.  Plaintiffs have likewise not

pleaded facts demonstrating that Brooks was in contact with, or directly supervised, the

individuals who drafted and/or issued the press releases on News Corp.'s website.

Moreover, the allegedly "striking stylistic and thematic similarities" between

Brooks' July 10, 2009 letter to Parliament and the News Corp. press releases are not apparent to

21

this Court.  While both the letter and the press releases make reference to (1) a "compliance programme" at the News of the World; (2) allegedly misleading statements made in the Guardian; (3) the claim that "thousands" of mobile phones or individuals were hacked; (4) police officers' "thorough investigation" of Mulcaire and Goodman; and (5) the absence of a "connection between the Information Commissioner's investigation and the allegation of hacking into telephones or accessing telephone voicemails," this is hardly proof of a common author, or evidence that Brooks drafted, reviewed, authorized, and/or disseminated the News Corp. press releases.  See Pltf. Brooks Opp. (Dkt. No. 108) at 5-5; Zohrabian Decl. (Dkt. No. 110) Ex. 1 (Brooks letter); SAC Exs. A & B (press releases).  Instead, these are points that one would expect to see in any statement seeking to refute allegations in the Guardian of widespread phone hacking at News Corp. publications.

Finally, it cannot be inferred – simply from the fact that Brooks was the CEO of NI Group and a member of NI Group's board of directors – that she drafted, reviewed, authorized or disseminated the press releases posted on News Corp.'s website.

Plaintiffs' speculative allegations are insufficient to establish that Brooks was involved in creating, reviewing, authorizing or disseminating the press releases.  See Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level." (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, at 235-36 (3d ed. 2004) ("The pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

Even if Plaintiffs had pleaded facts demonstrating that Brooks played some role in the creation or dissemination of the News Corp. press releases, however, Plaintiffs have not pled facts demonstrating that Brooks' conduct was "'expressly aimed'" at New York and thereby

satisfies the "'effects test.'" Tarsavage, 3 F. Supp. 3d at 145 (quoting Licci, 732 F.3d at 173). The July 9 and 10, 2009 press releases were published on News Corp.'s website. See SAC Exs. A & B (press releases); id. ¶ 109 ("The July 9 and 10 press releases were both published . . . on NewsCorp's website."). In attempting to connect the press releases to New York, Plaintiffs allege that the "press releases were widely disseminated" (id.), reported on by New York news outlets (id.), and "relied upon by investors" trading News Corp.'s stock in New York. (Id. ¶ 110)

        While the operation of a website "may be felt nationwide – or even worldwide – . . . without more, it is not [itself] an act purposefully directed toward the forum state." Bensusan Rest. Corp. v. King, 937 F. Supp. 295, 301 (S.D.N.Y. 1996). To establish that Brooks "'expressly aimed'" her conduct at New York, Plaintiffs must allege more than the posting of press releases on a website that can be accessed in New York. Tarsavage, 3 F. Supp. 3d at 145 (quoting Licci, 732 F.3d at 173). They have not done so.

        Even if (1) Brooks participated in the creation and dissemination of the press releases, and (2) it was foreseeable that they would have an effect in New York, the exercise of personal jurisdiction over her requires more. "[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." In re Terrorist Attacks, 714 F.3d at 674. Instead, Plaintiffs must allege facts demonstrating that Brooks intentionally caused – i.e., expressly aimed to cause – an effect in the forum through her conduct. See Tarsavage, 3 F. Supp. 3d at 145 (citing In re Terrorist Attacks, 538 F.3d at 95, abrogated on other grounds by Samantar, 560 U.S. 305). Because the SAC does not plead facts

demonstrating that Brooks' actions were taken with the express aim of causing an effect in New York, the effects test is not satisfied.[7]

Because this Court does not have specific personal jurisdiction over Brooks, the claims against her must be dismissed.

## III.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Defendants argue that the claims of any individuals who purchased News Corp. stock prior to February 15, 2011 are time-barred, and that, accordingly, the expanded Class Period alleged by Plaintiffs in the SAC is precluded by the applicable statute of limitations. See News Corp. Br. (Dkt. No. 100) at 12-15; Brooks Br. (Dkt. No. 103) at 12; Hinton Br. (Dkt. No. 105) at 4) Defendants argue that because the Class Period cannot be expanded to begin earlier than February 15, 2011, none of the alleged misstatements prior to this date are actionable and, accordingly, the SAC fails to state a claim. (Id.)

### A.   Plaintiffs' Expanded Class Period Is Barred by the Statute of Limitations

Private actions for securities fraud must be brought within "2 years after the discovery of the facts constituting the [alleged] violation." 28 U.S.C. § 1658(b)(1). Plaintiffs allege that they were aware of the facts allegedly constituting securities fraud by at least July 2011. (SAC ¶¶ 11, 14) Plaintiffs first asserted claims on behalf of individuals who purchased stock between July 8, 2009 and February 14, 2011, when they filed the SAC on April 30, 2014. Accordingly, the two-year statute of limitations applicable to claims by these individuals had long since expired when the SAC pleading the expanded Class Period was filed. See Am.

---

[7] The remaining allegations regarding Brooks' suit-related conduct concern only conduct and statements made in England that relate to English nationals or entities. See SAC ¶¶ 9-10, 38, 82, 148-150, 166. These allegations do not demonstrate that Brooks "expressly aimed" any of her suit-related conduct towards the United States. Accordingly, these allegations are not sufficient to establish this Court's authority to exercise specific personal jurisdiction over her.

Cmplt. (Dkt. No. 33) ¶ 1 (providing for a Class Period running from February 15, 2011 to July

18, 2011); SAC ¶ 1 (providing for a Class Period running from July 8, 2009 to July 18, 2011).

Accordingly, the expansion of the Class Period to include plaintiffs who purchased stock prior to

February 15, 2011 is barred by the applicable statute of limitations unless the SAC's expansion

of the Class Period to add the pre-February 15, 2011 claims relates back to the filing of the

Complaint. See 28 U.S.C. § 1658(b)(1); Pltf. News Corp. Opp. (Dkt. No. 107) at 4 ("The

[Amended Complaint] was filed within the statutory time period and is not time barred.  The

operative false statements and omissions in the SAC are the same as in the [Amended

Complaint], as are the corrective events that are alleged to have caused class members' damages.

Because their claims are the same as those originally brought on behalf of the Class Members

[with post-February 14, 2011 claims], the claims of the [pre-February 15, 2011] Class Members

will relate back to the [filing of the Complaint] . . . ." (citations omitted)).

        Relation back is governed by Fed. R. Civ. P. 15(c).  Rule 15(c)(1) provides that

> [a]n amendment to a pleading relates back to the date of the original pleading
> when: (A) the law that provides the applicable statute of limitations allows
> relation back; (B) the amendment asserts a claim or defense that arose out of the
> conduct, transaction, or occurrence set out – or attempted to be set out – in the
> original pleading; or (C) the amendment changes the party or the naming of the
> party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if . . .
> the party to be brought in by amendment (i) received such notice of the action that
> it will not be prejudiced in defending on the merits; and (ii) knew or should have
> known that the action would have been brought against it, but for a mistake
> concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1).

        Courts have concluded that Rule 15(c)(1)(C) applies to amendments making

changes to named defendants, and "is also applicable to a proposed change of plaintiffs."

Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 19 (2d Cir. 1997); see Levy v.

U.S. General Accounting Office, No. 97 Civ. 4016 (MBM), 1998 WL 193191, at *5 (S.D.N.Y.

Apr. 22, 1998), aff'd, 175 F.3d 254 (2d Cir. 1999) (per curiam) ("Because . . . [the] Amended Complaint seeks to add . . . plaintiffs as additional parties to [the] lawsuit . . . Rule 15(c)[] governs whether that amendment relates back to . . . [the] original complaint."). The Advisory Committee Note to Rule 15(c) supports this conclusion, stating that "the attitude taken in . . . Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs." Fed. R. Civ. P. 15(c), Advisory Committee Note – 1966 Amendment.

"Courts have, however, disagreed concerning precisely how to apply 'the attitude' of Rule 15(c) to amendments adding new plaintiffs." In re Gilat Satellite Networks, Ltd., No. 02 Civ. 1510 (CPS), 2005 WL 2277476, at *25 (E.D.N.Y. Sept. 19, 2005). In particular, courts in this Circuit have differed as to whether Rule 15(c) requires that the omission of the new plaintiff from the original pleading be the result of a mistake. Compare Levy, 175 F.3d at 255 ("[T]he claims of the [added plaintiffs] in the . . . Amended Complaint do not relate back to the . . . timely complaint. [Plaintiff] did not seek to add the [additional plaintiffs] because of a mistake, as required by Fed. R. Civ. P. 15(c)[(1)][(C)].")[8]; In re Bennett Funding Group, Inc. Sec. Litig., 194 F.R.D. 98, 100 (S.D.N.Y. 2000) ("[W]ell-established case law and the clear dictates of Rule

---

[8] Levy makes reference to "Fed. R. Civ. P. 15(c)(3)(B)." Levy, 173 F.3d at 255. In 2007, "[t]he language of Rule 15 [was] amended as part of a general restyling of the Civil Rules. . . . These changes [were] intended to be stylistic only." Fed. R. Civ. P. 15 Advisory Committee Note – 2007 Amendment. As a result of the 2007 amendment, what was formerly Rule 15(c)(3)(B) was renumbered as Rule 15(c)(1)(C)(ii). Compare Fed. R. Civ. P. 15(c)(3)(B) (2006 ed.) (relation back permissible when "the amendment changes the party or the naming of the party against whom a claim is asserted if [inter alia] . . . the party to be brought in by amendment . . . knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party"), with Fed. R. Civ. P. 15(c)(1)(C)(ii) (2007 ed. to present) (relation back permissible when "the amendment changes the party or the naming of the party against whom a claim is asserted, if [inter alia] . . . the party to be brought in by amendment . . . knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity").

15(c) require that plaintiffs invoking the relation back doctrine demonstrate that their failure to add new plaintiffs was the product of some mistake, rather than a deliberate decision.") (citing Levy, 175 F.3d at 255), with Gilat, 2005 WL 2277476, at *25-26 (declining to require mistake for addition of new plaintiffs); In re South African Apartheid Litig., 617 F. Supp. 2d 228, 289 (S.D.N.Y. 2009) ("Courts in this Circuit have more recently rejected the suggestion that amendments seeking to add new plaintiffs must satisfy Rule 15(c)(1)(C)'s 'mistake' requirement.") (citing In re Simon II Litig., 211 F.R.D. 86, 145 (E.D.N.Y. 2002), vacated by 407 F.3d 125 (2d Cir. 2005); Gilat, 2005 WL 2277475, at *26).

Plaintiffs do not argue that they made a mistake in omitting potential plaintiffs who purchased News Corp. stock prior to February 15, 2011, from the Class Period set forth in the Amended Complaint. Instead, they argue that Rule 15(c)(1)(C)'s mistake requirement does not apply to an amendment seeking to add new plaintiffs to an action:

> Defendants' argument that plaintiffs should not be permitted to plead an expanded Class Period after previously making a "strategic decision" to plead a shorter one is without merit because it relies on discredited authorities like Levy . . . that require a showing that the omission of the parties from the original pleading was the result of a mistake.

(Pltf. News Corp. Opp. (Dkt. No. 107) at 7)  This Court concludes, however, that the weight of authority in this Circuit – including the Second Circuit's decision in Levy – indicates that relation back of an amended complaint adding new plaintiffs is permitted only where the omission of the subsequently-added plaintiffs from the timely-filed complaint was the result of a mistake.

A district court is, of course, "'bound by the decisions of [Second Circuit] panels until such time as they are overruled either by an en banc panel of [the Second Circuit] or by the Supreme Court.'"  Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 488 (2d Cir. 2011)

(quoting <u>United States v. Wilkerson</u>, 361 F.3d 717, 732 (2d Cir. 2004)).  In <u>Levy</u>, the Second

Circuit expressly endorsed the mistake requirement with respect to the addition of plaintiffs to an

action.  <u>See</u> <u>Levy</u>, 175 F.3d at 255 (relation back not appropriate because "Levy did not seek to

add the [additional plaintiffs] because of a mistake, as required by Fed. R. Civ. P.

15(c)[(1)][(C)]").

   Numerous courts in this Circuit have followed <u>Levy</u> and imposed a mistake

requirement where a plaintiff has added new plaintiffs and argues that "relation back" applies

under Rule 15(c).  <u>See, e.g.</u>, <u>In re Bennett</u>, 194 F.R.D. at 100; <u>Charlot v. Ecolab</u>, No. 12 Civ.

4543 (KAM) (VMS), 2015 WL 1439916, at *32-33 (E.D.N.Y. Mar. 27, 2015) ("In line with

Second Circuit precedent and the Advisory Committee's notes on Rule 15, this Court will apply

Rule 15(c)(1)(C)['s mistake requirement]" to newly added plaintiffs."); <u>In re Morgan Stanley</u>

<u>Pass-Through Certificates Litig.</u>, 23 F. Supp. 3d 203, 208-09 (S.D.N.Y. 2014) (amendment

sought to add new plaintiffs; held that "the relation back of claims by newly added parties is

limited to circumstances in which the failure to name the party in the first instance was the

product of mistaken identity" (citing <u>Levy</u>, 175 F.3d 254)); <u>Dumont v. Litton Loan Servicing,</u>

<u>LP</u>, No. 12 Civ. 2677 (ER), 2014 WL 815244, at *16 (S.D.N.Y. Mar. 3, 2014) ("[T]he Second

Circuit has itself applied the mistake requirement to newly added plaintiffs . . . , and this Court

has continued to do so as well." (citing <u>Levy</u>, 175 F.3d at 255)); <u>Lee v. Marvel Enterprises, Inc.</u>,

765 F. Supp. 2d 440, 454-55 (S.D.N.Y. 2011) (noting disagreement but applying mistake

requirement to newly added plaintiffs), <u>aff'd</u>, 471 F. App'x 14 (2d Cir. 2012).[9]

---

[9] Plaintiffs' principal authority in support of the proposition that <u>Levy</u> is no longer good law is
<u>In re South African Apartheid Litig.</u>, 617 F. Supp. 2d at 289, which relies on a vacated case from
the Eastern District of New York and does not address <u>Levy</u>.  This case does not permit the
Court to ignore <u>Levy</u>.

Given that <u>Levy</u> and its progeny hold that the Rule 15(c)(1)(C) mistake requirement governs "relation back" both where a plaintiff seeks to add new plaintiffs and where a plaintiff seeks to add new defendants, that requirement will be applied here.

As noted above, Plaintiffs have not argued that their failure to include the pre-February 15, 2011 purchasers in the Amended Complaint's Class Period was the result of a mistake. Accordingly, the SAC's expansion of the Class Period to include individuals who purchased News Corp. stock prior to February 15, 2011 does not relate back to the filing of the Amended Complaint. Any class period beginning prior to February 15, 2011 is therefore barred by the applicable statute of limitations.[10] See In re Bausch & Lomb, Inc. Sec. Litig., 941 F. Supp. 1352, 1365-66 (W.D.N.Y. 1996) (on motion to dismiss, where "[t]he third amended complaint purport[ed] to extend the [c]lass . . . period backward to include [otherwise time-barred] claims on behalf of persons who bought B&L stock [during an earlier time period]," but "the[ new] claims d[id] not relate back under Rule 15," expansion of class period was time-barred); In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 529 (S.D.N.Y. 2005) (amended complaint sought to expand class period to include plaintiffs whose claims would otherwise have been time-barred; held that "the class of Plaintiffs first appearing in the November 18, 2002 Amended Complaint (those who purchased [stock during the expanded class period set forth in amended

---

[10] In re Clearly Canadian Securities Litigation, 875 F. Supp. 1410 (N.D. Cal. 1995), cited by Plaintiffs, does not indicate that the class period may encompass claims that are barred by the applicable statute of limitations. Instead, this case articulates a rule similar to that set forth in Lattanzio, 476 F.3d at 153-54: "As the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made or insider trading allegedly occurring before or after the purported class period are irrelevant to plaintiffs' fraud claims." In re Clearly Canadian, 875 F. Supp. at 1420. Far from suggesting that a class period may include time-barred claims, In re Clearly Canadian simply sets forth the manner in which the class period limits the allegations upon which liability for fraud may be based.

complaint]) does not 'relate back' for statute-of-limitations purposes and is therefore time-barred and dismissed"); In re Adelphia Communications Corp., at *17 (S.D.N.Y. May 31, 2005) (where amended pleadings sought to add both new claims and new plaintiffs, and claims of new plaintiffs did not relate back to filing of original complaint, "[t]he class existing prior to the filing of the [amended complaint] may not be expanded").

Because the Class Period alleged in the SAC is barred by the statute of limitations, Plaintiffs' claims will be dismissed.

## IV.   **LEAVE TO AMEND**

Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).  District courts "ha[ve] broad discretion in determining whether to grant leave to amend . . . ." Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000).  Leave to amend may properly be denied in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'"  Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh v. City of N.Y., No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile.") (citations omitted).

In its March 31, 2014 decision dismissing the Amended Complaint, this Court granted Plaintiffs leave to amend.  Wilder, 2014 WL 1315960, at *9.  At this juncture – having filed a Complaint, an Amended Complaint, and a Second Amended Complaint – Plaintiffs have

30

not succeeded in pleading claims that can survive a motion to dismiss. Accordingly – based on the current record – it is not appropriate for this Court to grant Plaintiffs leave to amend.

While it appears unlikely that Plaintiffs can plead claims that will survive a motion to dismiss, this Court will permit Plaintiffs to move for leave to amend. Any proposed Third Amended Complaint is to be attached as an exhibit to the motion.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the SAC are granted. Any motion for leave to amend is to be filed by November 6, 2015.

Dated: New York, New York          SO ORDERED.
       October 6, 2015

_Paul G. Gardephe_

Paul G. Gardephe
United States District Judge

31